**UNION CARBIDE CORPORATION**

v.

**GRAVER TANK & MFG. CO., Inc., and the Lincoln Electric Company.**

**Civ. No. 607.**

United States District Court
N. D. Indiana,
Hammond Division.

Aug. 27, 1963.

James A. Fowler, Jr., Cahill, Gordon, Reindel & Ohl, New York City, Richard R. Wolfe, C. Frederick Leydig, Wolfe, Hubbard, Voit & Osann, Chicago, Ill., Nathan Levy, Crumpacker, May, Levy & Searer, South Bend, Ind., for plaintiff Union Carbide Corp.

Edward A. Haight, Haight, Simmons, & Hofeldt, Chicago, Ill., Dugald S. McDougall, Ooms, McDougall & Hersh, Chicago, Ill., Thomas V. Koykka, James R. Stewart, Arter, Hadden, Wykoff & Van Duzer, Cleveland, Ohio, Charles Bomberger, Hammond, Ind., for defendants Graver Tank & Mfg. Co., Inc., and the Lincoln Electric Co.

SWYGERT, District Judge.

This case is before the court on plaintiff's application for judgment pursuant to the Court of Appeals' mandate which directs that the judgment heretofore entered be vacated, and that plaintiff's damages be computed in accordance with the views expressed in the Court of Appeals' opinion dated August 31, 1960. 282 F.2d 653 (7th Cir. 1960).

The issues to be decided are:

1. The significance of the mandate that defendants are entitled to the benefit of the rule announced in Columbia Wire Co. v. Kokomo Steel and Wire Co., 194 F. 108 (7th Cir. 1911), for the so-called second period of infringement—that is, from July 1, 1948, to June 17, 1950.

2. Whether additional damages in the form of attorneys' fees and costs are recoverable by plaintiff.

3. The date on which the money judgment to be entered became liquidated so as to start the accumulation of interest on said amount.

THE RULE IN COLUMBIA WIRE

The appeals court decision on this question reads:

(4) We agree with the Court's conclusion approving the Master's finding in fixing a reasonable royalty at 5¢ per pound of rod deposited, with the following reservations: * * * the Court erred in its conclusion that Union Carbide was entitled to recover the reasonable royalty determined by the Master during the period from July 1, 1948 to June 17, 1950 (the second period of infringement). We hold that for such period Lincoln was entitled to the benefit of the rule announced in Columbia Wire Co. v. Kokomo Steel & Wire Co., 7 Cir., 194 F. 108.

The Court of Appeals went on to say, "We * * * hold that the (Columbia Wire) rule must be applied to the second period of infringement, * * * during which time Lincoln's 700-series fluxes were available as substitutes or alternatives to its infringing flux."

Plaintiff contends that the application of the rule in Columbia Wire does not require any change in the single royalty of five cents per pound of rod deposited fixed by the master in his findings. Its contention is based on an interpretation of Columbia Wire to the effect that the rule laid down in that case applies only to noninfringing alternatives which became available prior to the date of commencement of the infringement.

Defendants do not espouse a different interpretation of Columbia Wire. But they contend that the Court of Appeals was well aware, when it spoke of the applicability of Columbia Wire, of the chronological order of availability of the 700-series fluxes, namely, that these substitutes or alternatives for plaintiff's Unionmelt were not available until six years after Lincoln started to infringe.

In the light of the obvious dissimilarity between the facts of Columbia Wire and those of the instant case, defendants cogently pose two rhetorical questions: "Why did the Court of Appeals reverse?" and "Why did it hold the Columbia Wire rule must be applied?" To attempt an answer requires a discussion of Columbia Wire.

The record and briefs filed in the Court of Appeals in Columbia Wire as well as the court's opinion by Judge Bak-

er have been studied, and I have reached certain conclusions which follow.

Columbia Wire decided a narrow question of time as an element in the proper standard of comparison between an infringing article and noninfringing substitutes on the question of damages. The patent owner there argued that damages should be measured only on the basis of noninfringing alternatives available at the date the patent issued and that noninfringing alternatives which became available before the commencement of infringement should not be considered. The Court of Appeals rejected that contention.[1] However, it specifically left open the question "To what extent, if at all, the law will permit an infringer to avail himself of developments in the art subsequent to his unlawful appropriation." The rule announced by the court in Columbia Wire is to the effect that "an infringer is only to pay for the advantages of the patented machine over machines that were *open to his use at the time of the unlawful appropriation."* [2]

---

1. Portions of the Columbia Wire court's discussion pertinent to our situation read:

   Findings of fact by the master included these: First. Appellee, after a period of infringement, changed its machines to a noninfringing type that produced at no greater expense as large a quantity and as good a quality of barbed wire as did the Bates machine. Second. When appellee appropriated the Bates invention, other machines that would have made a more favorable comparison with the Bates machine than did the Stover were open to appellee's use. * * * Applying to these findings *a rule that an infringer is only to pay for the advantages of the patented machine over machines that were open to his use at the time of the unlawful appropriation,* and not to pay for the advantages of the patented machine over machines that were open at the date of the patent, the master and the court held that there was no basis for a recovery of more than nominal damages. Appellant asserts (and justly it would seem) that to base the decree on the first finding would violate the rule of law adopted by the master. *To what extent, if at all, the law will permit an infringer to avail himself of developments in the art subsequent to his unlawful appropriation, as a defense or mitigation in an accounting, is a query to which we need not essay a definitive answer* if the master's rule is correct; for that rule applies to the second finding, and denies the contention on which appellant chose to rest its case, namely, that the only lawful standard is a comparison of the patented machine with the best that was available before the issuance of the patent.

   *       *       *       *       *

   No Supreme Court decision is known to us in which the recorded facts show that machines, devised since the patent and comparing with the patented machine more favorably than did the machines of the prior art, were open to public use at the time the defendant began the infringement, and in which such facts were held to be irrelevant.
   * * *
   But if, as here, other machines for doing the same work, though less effectively, were available at the date of the patent, the whole advantage would lie in the increase of efficiency. As to an infringer who at that stage of the art appropriated the invention, the standard of comparison is clear. He has taken to himself all the advantages that belonged exclusively to the patentee in the field of competition. *Fifteen years later, when the art has advanced to include other noninfringing machines,* available to manufacturers and more effective than those of the prior art, the patentee cannot avoid their competitive effect. At this stage the only actual advantage of the patented machine is its superiority, if any, over these later machines that are not dominated by the patent. *If at this stage one should choose to enter upon the manufacture* of barbed wire, he could take the later machines without giving the patentee any cause of action. (194 F. at pp. 108–110.) (Emphasis added.)

2. A helpful analysis of the Columbia Wire decision is found in Expanded Metal Co. v. General Fireproofing Co., 247 F. 899 (N.D. Ohio 1917), appeal dismissed, 272 F. 1021 (6th Cir. 1921). During the period of infringement, the infringer had developed a non-infringing alternative process which it urged as the standard of comparison in the accounting. This contention was rejected. The district court said:

   I am of opinion, however, from an examination of all the cases cited, that the other available process must have been in existence and open to public use

If then, the court here must apply the *rule* of Columbia Wire to the "benefit of" Lincoln as directed in the Court of Appeals' decision, it is obvious that it must do more than apply what Columbia Wire decided.

The date on which infringement commenced was sometime in 1942, some six years before the development of the 700-series fluxes. Literal application of the rule of Columbia Wire would result in no change in the prior computation of damages and the Court of Appeals would have directed that the district court do a useless thing. For any "benefit" to accrue to Lincoln, it seems apparent that the ratio decidendi of Columbia Wire must be extended to cover the specifically excepted hypothetical situation where an equivalent is developed "in the art subsequent to [defendant's] unlawful appropriation." (See second paragraph of footnote (1), supra.)

With due deference to the Court of Appeals' resolution of the question, I feel constrained to voice a serious policy argument against such an extension. Under the *extended* rule, an infringer is permitted to "take a chance" that developments will occur in the art at sometime during the remaining years of validity of a patent. Should he win his gamble, the only sanction that might be imposed by way of damages is that of a reasonable royalty (maximum) graduated downward to mere nominal damages (minimum), depending on the rated equivalency of the substitutes developed and open for use. Why negotiate license agreements? Surreptitious use of another's patented idea will never result in paying more than would have been paid had a license agreement been obtained. Pirating of another's ideas begins to look like sound business practice if the infringer may take full advantage of each and every improvement in the art that arises right up to the termination date of the patent, or at least to the time his infringement is detected. Discovery of the infringement may come too late for effective injunctive relief. In many instances the costs of litigation alone will prevent a patentee from bringing suit to recover merely nominal damages.

To state the argument differently: extension of the rule of Columbia Wire to

in its completed form at the time the infringer appropriates a patented process; he should not be permitted to avail himself of inventions developed by himself or others after he has appropriated another's property for the purpose of mitigating or avoiding the damage thus inflicted on another.

Much reliance is placed by defendant on Columbia Wire Co. v. Kokomo Steel & Wire Co. (7 C.C.A.) 194 F. 108, 114 C.C.A. 186. This case, it is said, holds that another process developed after the wrongful appropriation and during the period of infringement, may be used as a standard of comparison. I do not so understand it, nor was that question involved in the case. The article used as a basis was in existence at the beginning of the infringement. In the opinion it is said, and the master's finding was, that an infringer is only to pay for the advantages of the patented machine over machines that were open to his use at the time of the unlawful appropriation and not to pay for the advantages of the patented machine over machines that were open at the date of the patent. The question of whether the infringer would be permitted to avail himself of developments in the art subsequent to his unlawful appropriation as a defense in an accounting is expressly stated not to be involved. *The reasoning of the opinion (194 F.2d 110, 114 C.C.A. 188) induces the belief that, if the latter question had been before the Court, the holding would have been that the infringer is entitled to no more than had been found by the master, namely, that machines open at the time of the unlawful appropriation could be made available as a basis of comparison.* (Emphasis added).

This understanding of the case is supported by the later decision in the same circuit in Schnertz Wire Glass Co. v. Western Glass Co. (D.C.) 203 F. 1006, opinion by Sanborn, District Judge, affirmed on appeal, 226 F. 730, 141 C.C.A. 486. * * *

Apparently the court in Philadelphia Rubber Works Co. v. United States Rubber Reclaim. Works, 277 F. 171, 177 (2nd Cir. 1921), interpreted Columbia Wire in the same manner as did the judge in the Expanded Metal case.

facts similar to the present case apparently destroys the patent-granted monopoly as of the date equal or better products enter the market. An infringer may not only use the alternative or substitute products; he may utilize to his heart's content the teachings of the patent without being held to account for more than nominal damages, particularly if he is equipped to produce fast enough to evade effectively the injunctive processes of a court, such as Lincoln did in speeding up production during the closing months prior to the Supreme Court's final action approving the district court's issuance of an injunction. Such a result appears to be out of keeping with the purposes and intent of our patent laws.

In spite of what I feel to be the only interpretation that can possibly be given Columbia Wire and the misgivings I have just expressed, I feel driven by the language in the opinion of the appeals court to apply, or more appropriately, extend Columbia Wire to the facts of this case so as to give Lincoln the "benefit" of the *rule* announced therein.

Plaintiff further contends that irrespective of the applicability of the Columbia Wire rule, it was not until June, 1950, that Lincoln developed its 760 flux which was for all intents and purposes a full substitute for its infringing 660 flux and could be used. interchangeably with plaintiff's patented Unionmelt flux. This contention is supported by the master's findings [3] on this point, which finding was adopted by the district court on review of the master's report.

Upon appeal from the judgment on the accounting, plaintiff argued before the Court of Appeals that the 700 series fluxes were not available to defendant "until the very last month of infringement," in 1950. The Court of Appeals rejected this argument in saying:

> The main contention of Union Carbide on this point is that the 700-series fluxes were not available to Lincoln during the infringement period. (The second period of infringement extended from July 1, 1948 to June 17, 1950.) The findings as shown are to the contrary. Moreover, there is testimony to the effect that these 700 fluxes were as good as the patent flux, that they were interchangeable with Lincoln's infringing flux and that more than eleven million pounds of these fluxes were sold and commercially used during the period of infringement. *That they were as good in performance as the patent flux was recognized by the Court, as* [4] *previously*

---

3. The Master's finding number 59 reads:
 59. Near the end of the period of infringement, after adverse decisions of the Court of Appeals and the United States Supreme Court, the Lincoln engineers were able to develop and field test non-infringing fluxes and to substitute them commercially for the infringing 660, as follows:
 The 770 flux was first field tested in July, 1948, and was first shipped commercially in September, 1948. It was superseded by the 780 flux and shipments discontinued in July, 1949. The 780 flux was first field tested in February, 1949, and first shipped commercially in March, 1949. This flux was not for heavy plate. The 760 flux was first field tested in June, 1950, and first shipped commercially in June, 1950.
 These fluxes are made from the same raw material as 660 and cost less than 660 to manufacture.

4. Historically, it should be noted that Union Carbide's own expert, Dr. Dean, testified in the contempt case:
 Q. Have you made any determination by way of trial or test as to whether or not it is feasible to substitute any one or all of the Defendants' present fluxes, that is, the ones before us now, 760, 770, 780, and 840, for Plaintiff's Unionmelt Grade 20 in an actual welding machine?
 A. They are quite interchangeable. In fact, I have known welders in industry to interchange one with the other.
 Q. And what do you do when you interchange them?
 A. We just put some of this flux in the hopper, instead of some of the other kind.
 Also, there is Judge Dewey's statement in the contempt proceeding:
 * * * I am abidingly satisfied that the fluxes of the defendants, towit: Lincolnweld 770, 780, 760 and 840 are

*shown.* 282 F.2d 670–671. (Emphasis added.)

■ Nonetheless, my reading of the appeals court decision convinces me that that court has left the district court no room for additional factfinding as to the interchangeability or availability of alternatives. The opinion clearly says that the 700 series fluxes were available during the second period of infringement and that these substitute fluxes were completely interchangeable with the patented and patent-infringing fluxes. Consequently, under the rationale of an extended Columbia Wire rule, as discussed above, only nominal damages may be awarded. A decision as to the amount of these nominal damages is reserved pending submission of briefs on the subject by opposing parties. It should be noted parenthetically that defendants stated during oral argument that nominal damages should amount to at least 1% of the sale price of all infringing flux sold during the second period of infringement.

ATTORNEYS FEES

Plaintiff requests an allowance to it in the new judgment to be entered of attorneys fees in the sum of $500,000 on the basis of the master's Finding No. 79,[5] for the services rendered in this proceeding leading to the permanent injunction issued July 17, 1950, pursuant to the interlocutory decree dated July 9, 1947.

The Court of Appeals in setting aside the additional compensatory damages fixed at $600,000 by the master and increased to $900,000, by the district court on review of the master's report, alluded to the fact that both the master and the district judge had commented that, in allowing additional damages over a reasonable royalty, consideration had been given to the "long and expensive litigation" which had put the plaintiff to an expense exceeding $600,000. The master recommended the damages be increased "as purely compensatory damages to cover the inconvenience, trouble and expense which the plaintiff has suffered by reason of the infringement and based on the fact that the plaintiff has been compelled to conduct long and expensive litigation and which the plaintiff should recover as reimbursement for what it has actually suffered * * *." The appeals court then went on to say in significant part:

> Judge Swygert, as a basis for increasing the award, referred to plaintiff's expenses, which amounted to $687,226.17. We know of no theory which would permit the recovery of expenses as general damages. Of course, if such expenses included attorney fees or court costs, they might be allowed as such under other provisions of law. We are not here concerned, however with that character of allowance.

Defendants contend that plaintiff's request for attorneys fees is barred by (1) the law of the case as propounded by the Court of Appeals, (2) failure of plaintiff to except to the master's denial of allowance of attorneys fees as such, and (3) plaintiff's own misconduct.

---

substantially the same with respect to silicates as required by the patent; that such fluxes infringe because the elements in the compositions are first, substantially the same thing as required by the Jones et al. patent, and second, operate substantially the same way; and third, they substantially accomplish the same results.

5. Finding of fact number 79, made by the master and approved by the district court reads:
    79. The plaintiff incurred and paid attorneys' fees and other litigation expenses in the proceeding leading to the Interlocutory Decree dated July 9, 1947, in the amount of $687,226.17. These expenses were wholly incurred in connection with the proceedings before Judge Swygert leading to the Interlocutory Decree dated July 9, 1947, and with the subsequent appellate proceedings in the United States Supreme Court in review of that decree. A reasonable fee for the services rendered by plaintiff's attorneys in the proceeding leading to the Interlocutory Decree in the herein matter dated July 9, 1947, is the sum of $500,000.

■ As to their first contention, I read the Court of Appeals' decision and its remand to this court for a recomputation of damages on this point with the same literalness that I have in putting into effect, for the benefit of Lincoln, an extended Columbia Wire rule. Literal meaning, which I must accept under the mandate, cuts both ways; even-handed justice requires no less. A literal interpretation of Judge Major's opinion for the court can mean only one thing, namely, attorneys fees may be allowed under 35 U.S.C. § 285.[6] No other conclusion can be reached when the words of the court are considered, "Of course, if such expenses included attorney fees or court costs, they might be allowed as such under other provisions of law."

■ As regards defendants' second contention in which they argue that no attorneys fees may be awarded because the master awarded none and plaintiff took no appeal from that decision, I can only conclude that their position is wholly unrealistic and untenable. The master believed attorneys fees were included in the award of additional damages and it is reasonable to believe that plaintiff believed so too. Certainly defendants cannot contend that plaintiff was obligated to appeal from a judgment giving plaintiff what it had asked for. The error of the master and the district court in not properly denominating the items covered in the award of additional damages should not redound to the detriment of plaintiff which has done all it could to save its rights in this respect.

■ The defendants' charges of plaintiff's misconduct seem to be beside the point. They overlook the fact that plaintiff's patent, admittedly a revolutionary one, was sustained by the Court of Appeals and by the Supreme Court, and that that Court reaffirmed the judgment of validity after affording defendants the unusual right to a rehearing.

Vituperation by defendants' counsel and their attempt to reargue the validity of the patent ought not smudge the simple facts of this case. These facts are: plaintiff was granted a patent by the patent office; its validity has been upheld by the courts; and it has been infringed by defendants. The Court of Appeals has determined that defendants were not conscious and wilful infringers and I must and do accept its determination. The statute, however, provides that damages and other consequences, if proper, follow.

■ So the question remains: Is this an exceptional case in which reasonable attorneys fees should be awarded?

I am aware of the Court of Appeals' admonition pronounced in Apex Electrical Mfg. Co. v. Altorfer Bros. Co., 238 F. 2d 867 (7th Cir. 1956), that the trial court, if attorneys fees are awarded, must make special findings to show the basis of its award. For that reason I make the following findings of fact on which I base the conclusion that this is an exceptional case in which plaintiff, the prevailing party, is entitled to the amount of $500,000 for attorneys fees, the sum which the master found and which I now find to have been reasonable in amount.

The defendants from the inception of this lawsuit have raised many issues not directly going to the question of validity and infringement, for example, questioning the court's jurisdiction over Lincoln, and the defenses of estoppel. Also, vexatious confusion has been part of defendants' tactics to put off meeting the issues head-on. Foremost in my thoughts is the misleading welding demonstration given pursuant to the court's order on May 21, 1946. In addition, it should be noted that Lincoln increased its production of the infringing flux to 4,767,900 pounds in 1950, despite the fact that the Court of Appeals had affirmed this court's

6. 35 U.S.C. § 285 reads:
   The court in exceptional cases may award reasonable attorney fees to the prevailing party.

decision of validity and infringement in April 1948, and the Supreme Court had affirmed the Court of Appeals' decision in February 1949. This increased production took place in spite of the fact (as the Court of Appeals found) that the 700 series fluxes were a full substitute for the 660 flux and therefore could have been readily used by defendants to meet their requirements without further infringing plaintiff's patent.

I have been with this case from its inception and I am firmly convinced that Lincoln has done everything within its power to defeat or avoid the patent monopoly which rightfully belonged to plaintiff. Certainly it has a right to do this up to a point. I believe they have far exceeded the bounds to which businessmen, solicitous of their rights, are permitted to go without passing into the "exceptional" case envisioned by the statute. Sometimes negatives are as strong as positives. I think it is significant that the master rejected the following finding requested by defendants:

> Defendants have not been guilty of any unconscionable conduct in their defense of this action, and their defense has been conducted in good faith.

Had the master adopted this finding, I would have had to set it aside, after considering all the matters to which I have alluded.

## INTEREST

I believe the ruling of the appeals court decision on interest is that there is to be no interest until the amount owed is liquidated. The holding that interest was to run from the date of the master's report falls into this category as to the first period of infringement. It is doubtful that the appeals court intended to have all interest accumulate from the date of the master's report—even on the unliquidated damages covering the second period of infringement—an amount made uncertain by the appeals court decision remanding the case for recomputation of the damages for the second period. Interest on the recomputed amounts will run from the date this court enters judgment that such amounts are owed.

## POST OPINION BRIEFS

Counsel are directed to submit briefs solely on the question of what the amount of nominal damages should be for the second period of infringement. Plaintiff should submit its brief on or before September 20, 1963, and defendants on or before October 1, 1963. Counsel for plaintiff shall also submit along with its brief, a form of judgment consistent with the mandate of the Court of Appeals and with this opinion.